UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------x
CHRISTINA M. CALIX,

                                    Plaintiff,

          —against—

CAROLYN W. COLVIN, ACTING
COMMISSIONER OF SOCIAL SECURITY,

                                    Defendant.
--------------------------------------------------------x

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★  MAY 2 3 2016  ★

BROOKLYN OFFICE

**MEMORANDUM AND ORDER**

13-CV-4867 (SLT)

**TOWNES, United States District Judge:**

Plaintiff Christina M. Calix brings this action pursuant to Section 205(g) of the Social

Security Act, as amended, 42 U.S.C. § 405(g), seeking review of a final decision of defendant

Carolyn W. Colvin, Acting Commissioner of Social Security, which held that plaintiff was

ineligible for Supplemental Security Income because she had not been under a disability at any

time since her claim was filed.  Plaintiff and the Commissioner now cross-move for judgment on

the pleadings pursuant to Fed. R. Civ. P. 12(c).  For the reasons set forth below, the

Commissioner's motion is denied and plaintiff's cross-motion is granted to the extent of

remanding this action to the Commissioner for further proceedings in accordance with this

opinion.

## ***BACKGROUND***

The following facts are drawn from the Administrative Record in this case.  Plaintiff was

born in September 1985, and raised in Brooklyn (42-43, 437).[1]  She graduated high school and,

sometime in 2003, moved with her family to Virginia (43, 211, 437, 449).  There, she held

several low paying jobs.  First, she worked at a McDonald's restaurant in Hopewell, Virginia,

--------------------

[1]Numbers in parentheses denote pages in the Administrative Record.

where she started either in December 2003 or sometime in 2004 as a member of the "crew" (183, 211). She then worked for three months at Michael's Arts and Crafts in Colonial Heights, Virginia, where she stocked shelves and worked the cash register (183, 211). In January of either 2005 (183) or 2006 (211), plaintiff returned to McDonald's where she remained until either February 2006 (183) or sometime in 2007 (211). At some point during her tenure at McDonald's, plaintiff became a "swing" manager (183, 211).

While in Virginia, plaintiff entered into a relationship with an older man and became pregnant (449). The man apparently wanted nothing to do with the child, who was born sometime in 2005 (449). Thereafter, plaintiff entered into a relationship with another man, Alberto Acevedo, and sometime in either 2006 (449) or 2007 (211), decided to move back to New York City with him (449). Plaintiff has continued to maintain a relationship with Acevedo at all times relevant to this case, although the two have never married (43, 424).

A couple of months after returning to New York, plaintiff became pregnant again (45). Acevedo was earning enough money so that plaintiff did not need to work outside the home and plaintiff opted to be a stay-at-home mother (45). A few months after giving birth to a second son, plaintiff became pregnant with a third child (45). Plaintiff never returned to the workplace and has remained a stay-at-home mother ever since (45).

### The Motor Vehicle Accident

At approximately 9:00 a.m. on December 2, 2009, plaintiff was involved in a motor vehicle accident in which the car she was driving was struck head-on by a motorcycle (346). Her vehicle's airbag apparently did not deploy and plaintiff struck her head, right wrist and left knee on the inside of the car (347). She was transported by ambulance to Long Island College

Hospital ("LICH") in downtown Brooklyn, complaining of severe pain in the head, right wrist and left knee (346).

Dr. Michael Tang, the physician who examined plaintiff at the LICH Emergency Room, ordered X-rays of plaintiff's right wrist, forearm, and elbow and her left knee (350-53). The X-rays did not reveal any fractures or dislocations, and Dr. Tang diagnosed contusions of the left knee and right wrist (350-53). Although Dr. Tang gave plaintiff a tablet of Percocet at the hospital (347),[2] he prescribed only Motrin 600 mg (349), a non-steroidal anti-inflammatory drug which is now available without a prescription. Http://www.drugs.com/imprints/motrin-600-5258.html.

Although the Emergency Room directed plaintiff to follow-up with an orthopedic clinic the next day (353), the Administrative Record contains no medical records for the week following the accident. However, there are records alluding to medical visits during this period. First, the Administrative Record contains a one-page, handwritten note from a Dr. Charles L. Harewood, which certifies that he "first became aware" of plaintiff's automobile accident on December 8, 2009 (222). According to plaintiff, Dr. Harewood is her primary care physician and "has been [her] doctor [her] whole life" (71). Plaintiff claims that she does not see Dr. Harewood frequently, but sees him when she is sick (71). Nonetheless, the Administrative Record does not contain any records from Dr. Harewood, aside from the one-page note.

---

[2]Percocet contains a combination of oxycodone, a narcotic pain medication, and acetaminophen, a less potent pain reliever that increases the effects of the oxycodone. Http://www.drugs.com/percocet.html.

Second, a summary of medical benefits provided to plaintiff by Progressive Insurance during the period between December 2, 2009, and July 15, 2010 (243-57; 568-82), indicates that plaintiff received treatment from Mermaid Chiropractic, P.C., and Broad Street Accupuncture P.C. on December 10, 2009 (243, 568). Plaintiff continued to visit both providers on a regular basis thereafter until June 25, 2010, seeing each provider on at least a weekly basis at first, and at least on a monthly basis by June 2010 (243-57; 568-82). However, the Administrative Record does not contain any records from these providers, either.

On December 11, 2009—over one week after the accident—plaintiff paid the first of many visits to Interpublic Medical, PC ("Interpublic"), which styles itself as a "Diagnostic and Treatment Center" (308). There, a Dr. Kumari-Gambhir took plaintiff's medical history and conducted a physical examination. Plaintiff told the doctor that she was still suffering severe pain in her right wrist, which she rated as a 9 on a scale of 1 to 10, and less severe pain in her left knee and lower back, which plaintiff rated as a 6 or 7 on a scale of 1 to 10 (308). In addition, she told the doctor that she had headaches and insomnia, shooting pains down her left leg, and was suffering from stress and anxiety (308). Plaintiff claimed that her pain was exacerbated by walking, going up stairs, bending down, carrying heavy objects and prolonged sitting or standing (308).

During the physical examination, Dr. Kumari-Gambhir noted that plaintiff had a reduced range of motion in her right wrist and lumbar spine (309-10). Plaintiff was unable to flex or extend her wrist at all, complained of pain when flexing and extending her lumbar spine, and had pain in the back of the left knee (309-11). The doctor diagnosed plaintiff with a sprain or strain of the lumbar spine and right wrist, and a contusion of the right knee (311). The doctor

4

ordered an X-ray of the left knee and MRIs of the right wrist and lumbar spine, provided plaintiff with knee and wrist supports, and suggested that plaintiff consult a neurologist and psychologist (312). The doctor also prescribed thrice-weekly physical therapy for the next month (312).

New York Diagnostic Medical Care, P.C., performed the MRI of plaintiff's wrist on January 8, 2009. The study was largely normal, except for a slightly increased scapholunate interval (233, 318, 390).[3] The radiologist could not exclude the possibility that plaintiff had scapholunate ligament disruption—an injury involving the ligaments attaching two wrist bones, the scaphoid and the lunate. *See* http://sportmedschool.com/?page_id=528. The radiologist recommended "clinical correlation," meaning an examination of plaintiff's history and clinic tests to determine whether the injury existed and was symptomatic.

New York Diagnostic Medical Care, P.C., performed the MRI of plaintiff's lumbar spine on January 13, 2009. That test revealed bulging discs at L2-3, L3-4, and L4-5, each with "a mild impression on the left neural foramina" (306-07, 315-16).[4] At a follow-up appointment with Dr. Kumari-Gambhir the day before the MRI, plaintiff complained of pain in the vicinity of these discs, prompting the doctor to prescribe Naproxen (314).[5]

---

[3] The scapholunate interval is a radiographic measurement of the scapholunate joint in the wrist. *See* http://radiopaedia.org/articles/scapholunate-interval.

[4] Neural foramina are openings between vertebrae through which nerves leave the spine and extend to other parts of the body. *See* http://www.medicinenet.com/script/main/art.asp?articlekey=24085.

[5] Naproxen is a non-steroidal anti-inflammatory drug used in the treatment of back pain. *See* http://www.drugs.com/imprints/500-naproxen-4931.html. Although Dr. Kumari-Gambhir's notes state that he "called in" a prescription for Naproxen 500 mg, such pills are no longer subject to the Controlled Substances Act. *Id.*

The Administrative Record does not contain any report relating to the X-ray of the left knee which Dr. Kumari-Gambhir ordered. However, the Administrative Record does contain a report relating to an X-ray of the lumbosacral spine that was performed on December 16, 2009 (230). Although that report—which revealed only mild scoliosis of the lumber spine—was addressed to a Dr. Stephan Howard Cooper, the Administrative Record does not contain medical records from this doctor or indicate this doctor's affiliation or specialty.

Plaintiff continued to visit Interpublic on a regular basis for approximately six and one-half months. At first, plaintiff attended physical therapy three or four times a week (334). On February 22, 2010, and March 22, 2010, Dr. Kumbar-Gambhir reduced the physical therapy, first to three sessions per week and then to two (326, 330). However, on April 25, 2010, Dr. Kumbar-Gambhir increased the physical therapy to three sessions a week, and plaintiff continued to attend physical therapy thrice weekly until late June 2010 (321, 324).

At the same time she was visiting Interpublic, plaintiff may have also been visiting a neurologist and obtaining physical therapy through another provider. The summary of medical benefits provided to plaintiff by Progressive Insurance during the period between December 2, 2009, and July 15, 2010, indicates that plaintiff paid several visits to Definitive Medical Care P.C.—a provider of neurology and psychiatry services—between January 5, 2010 and April 1, 2010 (245-53). On January 8, 2010, plaintiff received services from Yongming Mao, a neurologist (246). The insurance company was also regularly billed for services provided by O&R Physical Therapy, P.C., and Maxmillian Massage Therapy, P.C. (246-254). The Administrative Record does not contain medical documents from any of these providers.

Dr. Ezekiel Akande of Interpublic referred plaintiff to the Ambulatory Surgery Center of East Tremont Medical Center for Lumbar Epidural Steroid Injections and Trigger Point Injections (394, 566). The Administrative Record contains post-operative instructions from the Ambulatory Surgery Center suggesting that plaintiff received these injections on March 2, 2010 (242). However, the summary of medical benefits provided to plaintiff by Progressive Insurance indicates, and the referral from Dr. Akande suggests, that plaintiff received injections on at least two other dates: February 18 and 25, 2010 (250-51, 394, 566). There are no medical records pertaining to these two procedures.

On May 24, 2010, Dr. Stanley S. Remer performed surgery on plaintiff's right wrist at the Ambulatory Surgery Center (391-92). Although the Administrative Record contains no records from Dr. Remer aside from his operative report, that report indicates that Dr. Remer had diagnosed plaintiff with right wrist synovitis—inflammation of the synovium or synovial membrane, the smooth lining of a joint. *See* http://arthritis.about.com/cs/diagnostic/g/synovium. htm. Dr. Remer performed a synovectomy—an operation to remove part or all of the synovial membrane, *see* http://www.orthopale.com/synovectomy.php—and a debridement of a partial tear of the scapholunate ligament and triangular fibrocartilage (391-92).[6]

According to plaintiff, the insurance which had been paying for her therapy at Interpublic ran out in late June 2010 (72-73). At that juncture, Interpublic discharged her, saying "you're as good as you're going to get." (73). However, plaintiff claims that she "didn't feel any better" than she had at the start of therapy (73).

---

[6]Debridement is the process of removing dead or damaged tissue. Http://medical-dictionary.thefreedictionary.com/debridement. In this case, the tissue was removed from, *inter alia*, the ligament that holds together the scaphoid and lunate bones.

It is unclear what, if any, medical treatment plaintiff received during the second half of 2010. The Administrative Record contains a report of a nerve conduction study and an electromyography performed by a Dr. Appasaheb Naik on July 28, 2010 (380-382). The studies found evidence of left Carpal Tunnel Syndrome and left L4-5, L5-S1, and right C5-6 radiculopathy (382). The doctor recommended use of a "cock-up splint" on the wrist at night, and adding cervical and lumbosacral traction to "the patient's treatment" (382). However, the Administrative Record contains no other records from Dr. Naik or any indication of the medical professional who referred plaintiff to Dr. Naik and to whom Dr. Naik made his recommendations. Indeed, aside from Dr. Naik's report, there is no record that plaintiff received any medical treatment between the time she was discharged by Interpublic and early 2011.

## *Plaintiff's Claims for SSA Benefits*

On or about August 27, 2010, plaintiff applied to the Social Security Administration ("SSA") for both Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") (150-57).[7] A Disability Report completed about that time alleges that plaintiff's ability to work was limited by conditions afflicting her right wrist and arm and by damage to three discs in her back (193). The Medical Treatment section of the Disability Report lists four medical providers: LICH, Interpublic, East Tremont Medical Center and Dr. Daniel Wilen (196-98). The Disability Report lists Dr. Wilen as the "Primary care provider for [her right] wrist, Nerve Damage in [her] back and [right] arm," and states that plaintiff first visited him in June

---

[7]Plaintiff's application for DIB is not at issue and need not be discussed.

2010 (196).[8] The report also states that plaintiff visited Dr. Wilen on August 26, 2010, and was scheduled for another appointment on October 7, 2010 (196). However, the Administrative Record not only lacks documents relating to any of these three visits, but contains no records of any visits to this provider until February 23, 2012 (295-97).

The SSA referred plaintiff to Industrial Medical Associates, P.C., for an Internal Medicine Examination. Dr. Jerome Caiati, who performed that examination on November 8, 2010, was apparently not provided with all of the medical records and obtained an incomplete and inaccurate medical history. For example, Dr. Caiati incorrectly recorded that plaintiff had "fractured her right wrist" in the 2009 automobile accident, and that the fracture had been "treated with open reduction internal fixation" (375).[9] While he correctly noted that plaintiff had suffered "lumbosacral trauma" during the accident, he was unaware of the extent of that trauma, stating, "full diagnosis unavailable" (375).

Dr. Caiati conducted an examination of plaintiff's entire body. He noted that plaintiff reported pain when flexing her lower back (376), and opined that she would have a "minimum to mild limitation" in bending and lifting because of that pain (377). He also noted a reduced range of motion in plaintiff's right wrist, stating "right wrist dorsiflexes 50 degrees and

---

[8]The summary of medical benefits provided to plaintiff by Progressive Insurance indicates that plaintiff may have first consulted Dr. Wilen, an orthopedic surgeon, on July 15, 2010, not in June 2010 (256).

[9]Open reduction internal fixation is a method of surgically repairing a fractured bone. Generally, this involves either the use of plates and screws or an intramedullary rod to stabilize the bone. Http://orthopedics.about.com/cs/brokenbones/g/orif.htm. As discussed above, plaintiff's right wrist was not fractured and she did not undergo this type of surgery.

palmar flexes 60 degrees" (377).[10] However, he found her "[h]and and finger dexterity intact," that she had normal grip and pinch, and that she could touch all fingers to her thumbs (377). He opined that plaintiff was not limited in '[s]itting, standing, walking, reaching, pushing, pulling, and climbing" (377).

In late November 2010, the State agency handling plaintiff's claim denied plaintiff's application for SSI. The Explanation of Determination sent to plaintiff made no mention of plaintiff's wrist injury, stating instead, "[y]ou said you were disabled because of a back problem, and a hand problem" (86). It noted that the medical reports in the State agency's possession "did not show any conditions of a nature that would prevent [plaintiff] from working," and concluded that plaintiff's "condition" was "not severe enough" to keep her from performing light work (86). However, the Explanation of Determination specifically stated that the State agency had only the following "reports": "Inter Public [*sic*] Medical, report of 10/14/10; Industrial Medicine Assoc P.C., examination report of 11/04/10; Long Island College Hospital report for the period 12/03/09" (86). It asserted that no other reports were available (86).

Plaintiff timely requested a hearing before an Administrative Law Judge (90-91), asserting that her claim was "judged wrong" (171). Shortly thereafter, plaintiff began to visit two new medical providers: Pain Management & Rehabilitative Physical Medicine, P.C. ("Pain Management") and the South Beach Psychiatric Center ("South Beach"). Since the conditions being treated by these providers are quite distinct, the Court will describe the extensive records relating to each of them separately.

---

[10]Normal values are 70 to 90 degrees for dorsiflexion, the backward bending of the wrist, and 65 to 85 degrees for palmar flexion. *See* http://www.livestrong.com/article/93432-normal -range-motion-wrist/.

10

*Pain Management*

According to plaintiff, she was referred to Dr. Laurian Jacoby of Pain Management by Dr. Harewood (72). Plaintiff had slipped on some ice after a snowstorm and her back was "really, really hurting." (73). Having completed her course of treatment at Interpublic, plaintiff asked for "a referral to see another doctor to see if there ... [was] something else wrong" (73).

On February 1, 2010, plaintiff had a "comprehensive consultation" with Dr. Jacoby (418). Dr. Jacoby's examination revealed that the range of motion in plaintiff's cervical and lumbar spine and right knee were limited by pain and discomfort (419). Dr. Jacoby, who was in possession of Dr. Naik's report but not the MRIs, diagnosed plaintiff with both cervical and lumbosacral myofascitis and radiculopathy (419-20).[11] The doctor prescribed Flexeril, a drug which relieves muscle spasms, and Relafen, a non-steroidal anti-inflammatory drug used in the treatment of back pain (420). *See* http://www.drugs.com/pro/flexeril.html; http://www.drugs.com/imprints/relafen-500-302.html. Dr. Jacoby told plaintiff that he would "request authorization" for plaintiff to have physical therapy twice weekly, and asked plaintiff to bring copies of the MRI reports on her next visit.

Following this "comprehensive consultation," plaintiff saw Dr. Jacoby every month or two. On March 28, 2011, plaintiff complained of "significant intermittent low back [pain] radiating to both legs and feet ... with weakness, intermittent neck pain radiating to the right arm, forearm and hand with weakness and tingling[,] and right wrist pain and discomfort during

---

[11]Myofascitis is an inflammation of a muscle and its fascia. Http://medical-dictionary.thefreedictionary.com/myofascitis. Radiculopathy refers to compression of the nerve root, the part of a nerve between vertebrae, which causes pain to be perceived in areas to which the nerve leads. Http://medical-dictionary.thefreedictionary.com/radiculopathy.

motion" (416). The doctor's examination revealed a mild decrease in cervical flexion, extension and lateral rotation; a moderate decrease in lumbar flexion and extension; and a mild to moderate decrease in flexion and extension of the right wrist (416-17). The doctor ordered an MRI of the lumbar spine and prescribed Vicodin ES (417), a medication containing both acetaminophen and hydrocodone which is used to relieve moderate to severe pain. *See* http://www.drugs.com/mtm/ vicodin-es.html.

Plaintiff had an MRI of her lower back on April 25, 2011 (415). The MRI revealed the lumbar scoliosis which had been mentioned in the December 16, 2009, X-ray report, as well as bulging discs at L1-2, L2-3, L3-4, L4-5, and L5-S1. The MRI did not specify the degree to which these bulging discs were impinging on plaintiff's nerves.

At her next visit to Dr. Jacoby, on May 26, 2011, plaintiff's range of motion was slightly worse than before. The doctor now characterized plaintiff as having a moderate decrease in cervical flexion, extension and lateral rotation and a moderate decrease in flexion and extension of the right wrist (412-13). Noting the possibility of peripheral nerve entrapment, the doctor ordered that plaintiff undergo further nerve conduction velocity studies and an electromyography in order to evaluate her neurological deficits (413). The doctor also refilled her prescription for Vicodin ES and ordered an MRI of the right wrist (413).

The electrodiagnostic studies were conducted on June 1, 2011. The nerve conduction velocity studies revealed a mild right cubital tunnel syndrome (408)—a compression of the ulnar nerve, which "gives feeling to the little finger and half of the ring finger ... [,] controls most of the little muscles in the hand that help with fine movements, and some of the bigger muscles in

12

the forearm that help ... make a strong grip." Http://orthoinfo.aaos.org/topic.cfm?topic=A00069. The electromyography also revealed a mild right C6 radiculopathy and cervical strain (408).

At a follow-up appointment on June 30, 2011, plaintiff complained of "an exacerbation of her neck pain," which radiated to her right arm, forearm, hand and fingers (406). She also complained of intermittent low back pain, which radiated down the left leg and caused numbness, tingling and weakness in her foot, along with significant right wrist pain (406). On examination, Dr. Jacoby noted that plaintiff had moderate to severe tenderness in the right wrist (406), which she attributed to right wrist arthropathy (407).[12] The doctor continued the Vicodin ES, prescribed Flexeril, and directed that plaintiff continue physical therapy twice a week (407). The Administrative Record contains no documents relating to the physical therapy.

On July 22, 2011, plaintiff returned to Dr. Jacoby's office. Her complaints were roughly the same as before (404). However, the doctor reduced her physical therapy to once a week and noted, "The patient requires referral to an orthopedic hand surgeon." (405).

*South Beach*

At the same time plaintiff was being treated by Dr. Jacoby, she was receiving mental health services from the Fort Hamilton Clinic of the South Beach Psychiatric Center. Plaintiff first visited South Beach on January 20, 2011, where she was screened by an intern, Nicole M. LePera, and her supervisor, Karen L. Kietzman, Ph.D. Plaintiff stated that she had been "depressed" on account of her accident and the resulting loss of functioning (434). She reported

---

[12]Arthropathy is a disease or an abnormality of a joint. Http://medical-dictionary. thefreedictionary.com/arthropathy.

"feeling angry, sad, and irritable," and feared that she would "lose control with her children" when she became angry (434). Kietzman and LePera diagnosed her with a "Depressive Disorder, Not Otherwise Specified," and accepted her for outpatient treatment (428-431).

Although South Beach's records indicate that plaintiff was prescribed Zoloft, an anti-depressant drug, on January 20 (522), plaintiff apparently received her initial mental health assessment from a psychiatrist on January 25, 2011 (520). On that date, she received a "second intake assessment" (518), in which she was interviewed by Dr. Ying Lan Wong (520-22). The doctor provided her with fourteen 25 milligram doses of Zoloft and prescribed individual therapy, group therapy, cognitive-behavioral therapy and help with "coping skills" (520).

Thereafter, plaintiff attended psychotherapy on a regular basis. Although it is unnecessary to describe the reports relating to that therapy in detail, the Court notes that the report of her February 24, 2011, session refers to a "recent arm injury and trip to the ER" in which plaintiff reportedly became "very frustrated due to the amount of pain she was in" and "yelled at the doctor" (515). The Administrative Record does not contain any emergency room records for this period. The Administrative Record does contain an X-ray of the right forearm performed in Dr. Wilen's office on February 28, 2011, which showed only soft tissue swelling (268, 583). However, there are no other records of a visit to Dr. Wilen in or around this time.

According to the records for July 5, 2011, plaintiff reportedly "talked at length about her physical pain and her recent referral to a specialist for her abdominal pain" (490). She stated that "[h]er doctor" believed she might have a hernia, and recommended that she "get a second opinion and ... see a surgeon for treatment" (490). The Administrative Record contains no evidence of any doctor's visits around this time.

South Beach's records for July 12, 2011, state that plaintiff reported seeing a surgeon regarding her possible hernia (486). She also reported that she was scheduled to undergo a CAT scan on July 13, 2011 (486). The Administrative Record contains no evidence of a visit to a surgeon in early July 2011, and no record of a CAT scan being performed around this time.

On July 21, 2011, plaintiff implied that she had undergone the CAT scan, reporting to her therapist that she had "two mini hernias" that would "just be monitored" (484). She also stated that she was scheduled for an MRI the following week (484). Again, the Administrative Record contains no evidence of a doctor's diagnosis regarding the hernias or an MRI around this time.

On August 2, 2011, plaintiff had her last appointment with LePera, who had been conducting her individual therapy (482). At that time, plaintiff was being medicated with a combination of Zoloft and Klonopin, a benzodiazepine used to treat anxiety (521). She was scheduled to see a new therapist, Alice Van Pelt, the following week.

***The First Hearing before the Administrative Law Judge***

Plaintiff had not yet seen the new therapist by August 11, 2011, when plaintiff first appeared before Administrative Law Judge Margaret Donaghy (77). Plaintiff apparently brought to the hearing three letters from her medical providers. The first was a note from Dr. Harewood dated August 9, 2011, which stated that plaintiff had been "having ongoing pain and dysfunction in her low back and right arm" since the automobile accident on December 2, 2009 (222). The doctor further stated, "[t]hese issues are being cared for by her specialists" (222), but did not name the specialists or state the degree of his involvement in her treatment.

The second letter, dated August 10, 2011, was signed by Dr. Jacoby and another employee of Pain Management. It stated that plaintiff was under Pain Management's care for both cervical and lumbosacral myofascitis and radiculopathy, right cubital tunnel syndrome, and right wrist arthropathy and internal derangement (220). It further stated that plaintiff had been prescribed Vicodin ES, Flexeril and physical therapy, and had been advised to follow up with a hand surgeon for a second opinion (220).

The third letter was undated, signed by Nicole LePera, MA, who described herself as a "Psychology Extern." The note stated that plaintiff had been a patient at South Beach's Fort Hamilton clinic since February 3, 2011, and was attending weekly individual psychotherapy sessions (223). The note also stated that plaintiff was being medicated with Clonazepam—the generic form of Klonopin, *see* http://www.everydayhealth.com/drugs/ clonazepam—and Sertraline—the generic form of Zoloft, *see* http://www.drugs.com/sertraline.html—and had monthly appointments to discuss her medication (223).

At the hearing, ALJ Donaghy tacitly acknowledged that, although she had "seven cases of medical evidence," she did not have complete medical records (70). First, she noted that she had a report from a Dr. Naik "about carpal tunnel syndrome," but that she had just the one report from him (70). She then questioned plaintiff about her treatment and established that Dr. Harewood was her "primary care doctor" (71), that Dr. Harewood had referred her to Dr. Jacoby (72-73), that she was receiving physical therapy at Pain Management (74), and that she had been going to South Beach since February 2011 (75-76). Plaintiff noted that LePera, whom she incorrectly identified as her "psychiatrist," had left South Beach and that she was slated to see "Ms. Alice" that afternoon (75).

Near the end of her questioning, the ALJ asked plaintiff if she "had any ER visits" or had received "treatment from any other doctors" (76). Plaintiff answered, "no," to both questions (76). However, plaintiff had previously testified that Dr. Jacoby had referred her to a hand specialist (73), and that she was "waiting for the referral to be approved" (74).

Following her questioning, ALJ Donaghy told plaintiff:

> [W]e have a few reports on the record and a few letters from the doctors here, but what I don't have is the treating notes to show that you've been continuously treated since August of 2010 and through the current time .... [W]e need those notes to assess your functioning and to determine what medications ... you have (77).

The ALJ further explained that she could not proceed with the hearing because she did not "have all of the information" (78). She asked plaintiff to sign authorizations for medical records and stated, "hopefully, by the time your case is rescheduled, we'll have a complete record ..." (78). The ALJ also stated that she would send plaintiff for another orthopedic evaluation and a psychiatric evaluation (80).

On August 12, 2011, ALJ Donaghy sent subpoenas for "all records" to Dr. Harewood, Pain Management, and South Beach (119-24). Pain Management responded by sending records for the period from February 1 to July 22, 2011 (403-20), which are described above. *See* pp. 11-13, *ante*. South Beach responded on August 23, 2011, by sending records for the period from January 20 to August 12, 2011 (421-537), which are described above at pages 13-15. However, Dr. Harewood appears not to have responded to the subpoena. It is unclear what, if any, further actions the ALJ took in an effort to obtain the records of plaintiff's primary care physician.

Although the ALJ stated that she would send plaintiff for a psychiatric examination, there is no indication in the Administrative Record that plaintiff received such an examination. Rather, plaintiff had an "Adult Intelligence Evaluation" on September 7, 2011, conducted by Christopher Flach, Ph.D., a psychologist employed by Industrial Medicine Associates, P.C. (538-41). Dr. Flach administered a standardized achievement test—the WRAT 3—and found that her score fell "within the average range of performance" (539).[13] He also administered IQ tests, which showed that plaintiff was "within the average range of intellectual functioning" (540). While Dr. Flach acknowledged that the results of his examinations appeared "consistent with some psychiatric problems" and that plaintiff had a "Depressive Disorder," he opined that the problems would only "mildly interfere with [plaintiff's] ability to function on a daily basis" (540). There is no indication that South Beach ever was asked for an assessment of plaintiff's mental ability to function in the workplace.

On the same day that plaintiff was evaluated by Dr. Flach, plaintiff had an orthopedic evaluation by Dr. Patricia Graham of Industrial Medicine Associates, P.C. According to Dr. Graham's report, plaintiff stated that she had "right wrist pain after ORIF," pain in her lower back and right shoulder, disk disease in her cervical spine and nerve damage at C6 (549). Upon examination, however, the doctor determined that plaintiff had a "full active [range of motion] without complaint of pain" in her cervical spine and a full range of motion, with no spinal or paraspinal tenderness, in her thoracic and lumbar spine (551). Although plaintiff told Dr. Graham that she had low back pain which increased if she sat or stood for more than 30

---

[13]The WRAT 3 is the third edition of the Wide Range Achievement Test, which tests basic academic skills in reading, spelling and arithmetic. *See* http://www.psyresources.com/products/mentalabilitytests/wrat3.

minutes, walked more than six blocks, or attempted to lift more than 30 pounds (549), and although the doctor diagnosed plaintiff as having low back pain (552), Dr. Graham opined that plaintiff had only "mild limitations with reaching, pushing, pulling and lifting using the right upper extremity" (552).

### The Second Hearing before the Administrative Law Judge

On November 2, 2011, plaintiff appeared at a second hearing before ALJ Donaghy. Plaintiff submitted two new documents: discharge instructions relating to an October 11, 2011, visit to the Maimonides Medical Center's Emergency Department and a letter from Dr. Jacoby dated October 27, 2011.

When asked about the former document, plaintiff explained that she had hyperextended her right wrist when she fell forward while trying to place one of her sons into a car (40). Thereafter, the pain "kept intensifying," prompting plaintiff to seek emergency medical treatment (40). Although the Emergency Department's discharge summary indicates that plaintiff was diagnosed with a right wrist sprain by a Dr. Samuel Parikh (561-63), the Administrative Record does not contain any records of Dr. Parikh's examination or any other hospital records relating to this emergency room visit.

The letter from Dr. Jacoby provided a very brief assessment of plaintiff's functional abilities which differed significantly from that provided by Dr. Graham. Dr. Jacoby's letter made no mention of any problems with plaintiff's right shoulder, stating that plaintiff was being treated for both cervical and lumbosacral myofascitis and radiculopathy, right cubital tunnel syndrome, and right wrist arthropathy and internal derangement (221). Dr. Jacoby opined that, because of those conditions, plaintiff could not lift, push or pull more than 10-20 pounds, should

19

"avoid fine motor use of the right hand" and could not "sit, stand or ambulate more than 1 hour continuously without changing positions" due to her low back and neck pain (221).

When reminded by the ALJ that she had a right to be represented, plaintiff stated that she had spoken to at least one attorney about her case but did not think she needed to be represented. Plaintiff stated that "all they [the attorneys] wanted was that letter that I got from Dr. Jacobi [*sic*]" (42). Plaintiff finally obtained that letter "very close to the date" of the second hearing, and elected to forego legal representation (42). Plaintiff explained, "I have all the evidence that I think that they could possibly get their hands on anyway" (42).

Although plaintiff had just handed her incomplete medical records and a letter containing an incomplete assessment of plaintiff's residual functioning capacity, the ALJ continued with the hearing. First, she questioned plaintiff and established that she was a homemaker who was raising her three sons largely on her own. Plaintiff described instances in which she had difficulties using her dominant right hand, stating that she would lose feeling in her hand and drop plates and cups (46); that she was unable to write more than a paragraph at a time (46), and that she could not lift even a gallon of milk (50-51). Plaintiff testified that she was able to perform many of the tasks necessary to care for her young sons, but only because she had "learned to do a lot of things with [her] left hand" (47). For example, she "learned how to cook with [her] left [hand]" (51), and washed the dishes slowly and "extra, extra careful[ly]" to avoid dropping them.

She also prevailed upon others—including her children and Acevedo, the father of her two youngest sons—to do the tasks she could no longer perform, such as the laundry and carrying groceries upstairs (51-52). Acevedo, who paid for her rent and "pretty much ...

20

everything" (44), stopped by at least once a day to assist with such tasks as bathing the boys and putting them to bed (54). In addition, plaintiff sometimes received help on weekends and received a lot of help from the boys' grandmother in the summer (55).

When asked what "problems" prevented her from returning to work, plaintiff mentioned her problems using her dominant right hand, pain in her back that prevented her from standing or sitting for more than an hour at a time, and "knots" in her shoulder (45-46, 49-51). Plaintiff stated that she had recently had two visits with a hand surgeon, Dr. Patel, and had his card (47). Although plaintiff provided the ALJ with the doctor's approximate address, the Administrative Record does not contain any documents from Dr. Patel or any other information concerning him.

The ALJ also took testimony from Andrew Vaughn, a vocational expert whom the ALJ had asked to appear (140-43). The ALJ first established that plaintiff's prior positions fit the definition of "light work" (56-57). The ALJ then asked the expert to opine whether a hypothetical person who was capable, *inter alia*, of sitting 30 minutes at a time for up to eight hours a day, standing 30 minutes at a time for up to four hours a day, walking one hour at a time for up to two hours a day, carrying 20 pounds occasionally and 10 pounds frequently, reaching overhead and pushing and pulling occasionally and "frequent handling" was capable of doing plaintiff's past work (57-59). Vaughn did not answer that question, but listed three other "light work" jobs which the hypothetical person could do and which were available in the national economy and in the region (59). The ALJ then asked if there was sedentary work available to such a hypothetical individual who also needed a "low-stress environment" (60-61). In response, Vaughn listed another three jobs which were available in the national economy and in the region (61).

It is unclear from Vaughn's testimony, however, whether such jobs would have been available to an individual who was unable to use the dominant hand for manipulative tasks. When the ALJ changed the hypothetical, asking Vaughn to assume an individual who could not "use ... the right dominant arm ... except for propping and support" and "could not use it for manipulative tasks," Vaughn testified that a "hypothetical individual unable to use their right dominant arm for any manipulative task would be unable to perform duties at the light level [INAUDIBLE] if we're looking at all the other limitations that were involved in terms of low-stress" (63). The ALJ asked the expert again, instructing him to focus on the hypothetical she provided, which made no mention of stress (63). Although portions of Vaughn's answer to this question were inaudible, the expert's opinion apparently remained unchanged. Vaughn stated, "Unable to use the dominant right hand — I would *still* say the job base would be [INAUDIBLE] (63) (emphasis added). When the ALJ then asked if there would be "any sedentary work jobs," the vocational expert stated:

> At sedentary, unable to use the right hand, where manipulations are at the frequent level — also the job base would be eroded at sedentary if the claimant — hypothetical individual is unable to use their right hand, which is the dominant hand (63).

### The ALJ's Decision

On December 21, 2011, the ALJ denied plaintiff's claims for SSI, concluding that plaintiff had not been under a disability as defined by the Social Security Act since August 27, 2010, the date she filed her application for benefits (23). In determining whether plaintiff was disabled, the ALJ used the five-step process prescribed by 20 C.F.R. § 416.920(a)(4). Under this five-step framework, the Social Security Administration ("SSA") must first consider the

22

claimant's work activity. If the claimant is currently engaged in "substantial gainful employment," the claimant is not disabled, regardless of the medical findings. 20 C.F.R. § 416.920(a)(4)(i). Otherwise, the SSA next considers the "medical severity" of the claimant's impairment. 20 C.F.R. §416.920(a)(4)(ii). If the claimant does not have "a severe medically determinable physical or mental impairment that meets the duration requirement"—i.e., is expected to result in death, has lasted or is expected to last for a continuous period of at least 12 months, *see* 20 C.F.R. § 416.909—"or a combination of impairments that is severe and meets the duration requirement," the claimant is not disabled. 20 C.F.R. § 416.920(a)(4)(ii).

In the third step, the SSA further considers the medical severity of the impairment by comparing the claimant's impairments to those impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. If the claimant has an impairment or combination of impairments which meets the duration requirement and is listed in Appendix 1 or is equal to a listed impairment, the claimant is disabled. 20 C.F.R. § 416.920(a)(4)(iii). If not, the SSA must proceed to the fourth step and assess the claimant's "residual functional capacity" and his or her ability to do his or her "past relevant work." 20 C.F.R. § 416.920(a)(4)(iv). If the claimant can still do his or her "past relevant work," the claimant is not disabled. *Id.* However, even if the claimant can no longer perform the past relevant work, the claimant is not disabled if he or she "can make an adjustment to other work." 20 C.F.R.§ 416.920(a)(4)(v). The SSA bears the burden of proof only with respect to this fifth step. The claimant bears the burden with respect to the other four steps. *Green-Younger v. Barnhart*, 335 F.3d 99, 106 (2d Cir. 2003).

In performing this five-step analysis, the ALJ found that plaintiff had not engaged in substantial gainful activity since August 27, 2010 (25), and had several severe medically

23

determinable impairments: cervical myofascitis, mild cervical radiculopathy, lumbosacral myofascitis, lumbar radiculopathy, mild right cubital tunnel syndrome and right wrist arthropathy and internal derangement (25). However, she found that those impairments were not so severe as to meet or medically equal the criteria of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, and that plaintiff retained the residual functional capacity to perform a range of light work as defined in 20 C.F.R. 416.967(b). Specifically, she found that plaintiff had the residual functional capacity to frequently handle items; to stand and walk for 30 minutes at a time for up to 4 hours a day; to sit for 30 minutes at a time up to 8 hours per day; and to reach overhead, push, pull, climb stairs and ramps, balance, stoop, kneel, and crouch occasionally (27). While the ALJ found that plaintiff's medically determinable physical or mental impairments could reasonably be expected to produce the pain and other symptoms which plaintiff alleged (27), she found plaintiff's statements concerning the intensity, persistence and limiting effects of her pain and symptoms to be incredible to the extent that they were inconsistent with the ALJ's own assessment of plaintiff's residual functional capacity (27). The ALJ stated that she accorded "some weight to Dr. Jacoby, treating physician," but disregarded the doctor's assessment of the plaintiff's limitations in using her hand because they were "contradicted by nerve conduction studies, claimant's activities of daily living, and the clinical findings of Dr. Caiati and Dr. Graham" (30).

The ALJ found that plaintiff was unable to perform any of her past relevant work because she could only stand for 30 minutes at a time, up to four hours per day (30). However, relying on the testimony of the vocational expert, the ALJ found that there were specific light work and sedentary jobs available in the national and regional economy which plaintiff could

perform (31). The ALJ concluded that plaintiff was "capable of making a successful adjustment to other work that exists in significant numbers in the national economy," and had "not been under a disability, as defined in the Social Security Act, since August 27, 2010" (31-32).

### *Post-Decision Developments*

On January 7, 2012, plaintiff filed a Request for Review of the ALJ's decision (19). Sometime within the next four months, she retained counsel (16-17). In May 2012, plaintiff's counsel sent the Appeals Council a copy of all the medical records in counsel's file (218). Many of these records were already in the Administrative Record. Indeed, all of the records which pre-dated the ALJ's decision were either documents which plaintiff had submitted to the ALJ personally or documents which the ALJ had summarized in her decision.

There were only two records which post-dated the ALJ's decision. The first was a one-page report from Doshi Diagnostics, providing Dr. Jacoby with the results of an MRI of the cervical spine taken on January 25, 2012. According to that report, the MRI revealed a right paracentral disc herniation at C3-4, with impingement upon the right side of the thecal sac (238).[14] The second was a one-page letter dated February 21, 2012, from Dr. Jacoby (258). Except for the date, the letter was identical to Dr. Jacoby's letter dated October 27, 2011 (221).

On August 13, 2012, counsel wrote a letter to the Appeals Council, arguing that the ALJ had failed to properly assess plaintiff's residual functional capacity and had failed to conduct a proper credibility analysis (212-14). With respect to the first point, plaintiff's counsel noted that

---

[14]The thecal sac is the protective membrane which surrounds the spinal cord and other vital neurological structures. Http://www.cure-back-pain.org/thecal-sac-impingement.html. By using the term "impingement," the radiologist indicated that the herniated disc was pressing against the thecal sac. *Id.*

25

the ALJ's assessment of plaintiff's residual functional capacity was based on her own interpretation of the medical evidence, rather than on a medical professional's assessment of plaintiff limitations and abilities (213). With respect to the second point, plaintiff's counsel argued that the ALJ erred in discrediting the plaintiff's statements concerning the intensity, persistence and limiting effects of her symptoms because they were inconsistent with the ALJ's own assessment of plaintiff's residual functional capacity (214).

On September 10, 2012, plaintiff's counsel sent the Appeals Council additional medical evidence (260). First, plaintiff's counsel sent a report of electrodiagnostic studies performed by Dr. Jacoby on August 6, 2012. That report noted that plaintiff was complaining of significant intermittent pain in her lower back, radiating to her legs, and that Dr. Jacoby performed nerve conduction studies and electromyography to rule out lumbosacral radiculopathy and peripheral nerve entrapment (261). The nerve conduction studies did not reveal peripheral nerve entrapment or peripheral neuropathy, but the electromyography revealed a mild L4-5 radiculopathy and lumbosacral strain (251).

The remaining medical records were from Dr. Wilen, an orthopedic surgeon. Although the Progressive Insurance records indicate that plaintiff first saw Dr. Wilen in July 2010 (256), and although a Disability Report indicated that plaintiff may have seen Dr. Wilen on several occasions in 2010 (196), none of the records supplied to the Appeals Council pre-dated February 28, 2011. Indeed, with the exception of a report of a largely normal X-ray of plaintiff's right forearm dated February 28, 2011, and a copy of a report of electrodiagnostic studies performed by Dr. Jacoby in August 2012, all of the records pertained to visits in 2012 in which plaintiff complained of knee pain (261- 299). These records revealed, *inter alia*, that Dr. Wilen

26

performed arthroscopic surgery on plaintiff's left knee on April 18, 2012, to repair torn menisci (298-99).

### The Appeals Council's Decisions

In a Notice of Appeals Council Action dated June 28, 2013, the Appeals Council denied plaintiff's request for review, stating that it had found no reason under its rules to review the ALJ's decision (9-14). On July 22, 2013, Plaintiff's counsel moved for reconsideration, asserting that the Appeals Council's notice did not acknowledge receipt of all of the medical evidence that had been submitted by plaintiff's counsel on May 21, 2012 (217-19). Plaintiff's counsel requested that the Appeals Council reopen the case to reconsider that evidence, then issue a revised decision which acknowledged receipt of those records (217).

In a Notice of Appeals Council Action dated August 21, 2013, the Appeals Council essentially granted the relief requested by plaintiff's counsel. The Appeals Council vacated its earlier decision and reconsidered the matter in light of the medical records referenced in plaintiff's counsel's July 22, 2013, letter (1-6). However, the Appeals Council again denied plaintiff's request for review, again stating that it had found no reason under its rules to review the ALJ's decision (1).

### The Instant Action

In late August 2013, plaintiff commenced this action, seeking review of the decision of the Commissioner of Social Security pursuant to Section 205(g) of the Social Security Act, as amended, 42 U.S.C. § 405(g). The Complaint principally alleges that the ALJ's decision was unsupported by substantial evidence and contrary to the Social Security Act. Complaint, ¶¶ 14-15. It also alleges that the Appeals Council's decision not to consider the medical evidence

submitted to it by plaintiff's counsel was erroneous. *Id.*, ¶ 12. The complaint attaches a copy of the plaintiff's counsel's May 21, 2012, letter and all of the medical evidence listed in that letter.

Plaintiff and defendant now cross move for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. In her Memorandum of Law in Support of Plaintiff's Motion for Judgment on the Pleadings ("Plaintiff's Memo"), plaintiff argues, *inter alia*, that the ALJ violated the "treating physician rule" by affording only "some weight" to Dr. Jacoby's opinion and disregarding, without adequate explanation, the doctor's assessment of plaintiff's limitations in the use of her hand based on the ALJ's own readings of nerve conduction studies and the opinions of non-treating physicians. Defendant opposes plaintiff's motion and cross-moves for judgment on the pleading, arguing that the ALJ fully developed the record and correctly found that plaintiff could perform a range of light work.

## DISCUSSION

### *Standard of Review*

A final determination of the Commissioner of Social Security upon an application for SSI benefits is subject to judicial review as provided in 42 U.S.C. § 405(g). *See* 42 U.S.C. § 1383(c)(3).[15] A court's review under 42 U.S.C. § 405(g) of a final decision by the Commissioner is limited to determining whether the SSA's conclusions were supported by substantial evidence in the record and were based on a correct legal standard. *Lamay v. Comm'r of Soc. Sec.*, 562 F.3d 503, 507 (2d Cir. 2009); *see Johnson v. Bowen*, 817 F.2d 983, 985 (2d

---

[15]Section 405(g) permits "[a]ny individual, after any final decision of the Commissioner of Social Security made after a hearing to which he was a party, ... [to] obtain a review of such decision by a civil action commenced within sixty days after the mailing to him of notice of such decision ... in the district court of the United States for the judicial district in which the plaintiff resides ...."

Cir. 1987). The district court has the "power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).

"Substantial evidence" connotes "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *see also Veino v. Barnhart*, 312 F.3d 578, 586 (2d Cir. 2002). "In determining whether substantial evidence supports a finding of the Secretary [now, Commissioner], the court must not look at the supporting evidence in isolation, but must view it in light of the other evidence in the record that might detract from such a finding, including any contradictory evidence and evidence from which conflicting inferences may be drawn." *Rivera v. Sullivan*, 771 F. Supp. 1339, 1351 (S.D.N.Y. 1991). The "substantial evidence" test applies only to the Commissioner's factual determinations. Similar deference is not accorded to the Commissioner's legal conclusions or to the agency's compliance with applicable procedures mandated by statute or regulation. *See Townley v. Heckler*, 748 F.2d 109, 112 (2d Cir. 1984)

"Where there is a reasonable basis for doubt whether the ALJ applied correct legal principles, application of the substantial evidence standard to uphold a finding of no disability creates an unacceptable risk that a claimant will be deprived of the right to have her disability determination made according to the correct legal principles." *Johnson*, 817 F.2d at 986. However, where application of the correct legal principles to the record could lead only to the same conclusion reached by the Commissioner, there is no need to remand for agency reconsideration. *Zabala v. Astrue*, 595 F.3d 402, 409 (2d Cir. 2010).

*Eligibility for SSI*

In order to be eligible for SSI, an individual must be blind, aged or disabled and fall within certain income and resource limits. *See* 42 U.S.C. §§ 1381, 1382(a). An adult individual is "considered to be disabled ... if he is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. §§ 1382c(a)(3)(A). The physical or mental impairment or impairments must be "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy ...." 42 U.S.C. §§ 1382c(a)(3)(B). The term, "work which exists in the national economy," is defined to mean "work which exists in significant numbers either in the region where such individual lives or in several regions of the country." *Id.*

In deciding whether a claimant is disabled, the Commissioner is required by the Social Security regulations to use the five-step process set forth in 20 C.F.R. § 416.920(a)(4) and described above. *See* pp. 22-23, *ante*. However, the Social Security regulations also dictate what evidence the Commissioner must consider and the manner in which the Commissioner must evaluate the evidence.

First, "[t]he SSA recognizes a 'treating physician' rule of deference to the views of the physician who has engaged in the primary treatment of the claimant." *Green-Younger v. Barnhart*, 335 F.3d 99, 106 (2d Cir. 2003). "According to this rule, the opinion of a claimant's treating physician as to the nature and severity of the impairment is given 'controlling weight' so

long as it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record.'" *Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008) (quoting 20 C.F.R. § 404.1527(d)(2)). "'[M]edically acceptable clinical and laboratory diagnostic techniques' include consideration of '[a] patient's report of complaints, or history, [a]s an essential diagnostic tool.'" *Id.* (quoting *Green-Younger*, 335 F.3d at 107).

"[T]he opinion of the treating physician is not afforded controlling weight where ... the treating physician issued opinions that are not consistent with other substantial evidence in the record, such as the opinions of other medical experts." *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004) (citing *Veino*, 312 F.3d at 588). "However, not all expert opinions rise to the level of evidence that is sufficiently substantial to undermine the opinion of the treating physician." *Burgess*, 537 F.3d at 128. For example, the Second Circuit has ruled that an opinion that a claimant had "moderate" limitations in his ability to lift and carry objects and "mild" limitations in standing, walking, pushing, pulling and sitting were "so vague as to render it useless in evaluating whether [the claimant could] perform sedentary work." *Curry v. Apfel*, 209 F.3d 117. 123 (2d Cir. 2000), *superceded by statute on other grounds*, 20 C.F.R. § 404.1560(c)(2).

"Genuine conflicts in the medical evidence are for the Commissioner to resolve." *Veino*, 312 F.3d at 588. However, an ALJ, despite having "considerable and constant exposure to medical evidence," remains a layperson. *Curry*, 209 F.3d at 123. Accordingly, while an ALJ is "free to resolve issues of credibility as to lay testimony or to choose between properly submitted medical opinions," *McBrayer v. Sec'y of Health & Human Servs.*, 712 F.2d 795, 799 (2d Cir.

1983) (quoting *Gober v. Matthews,* 574 F.2d 772, 777 (3d Cir. 1978)), an ALJ is not "permitted to substitute his own expertise or view of the medical proof for the treating physician's opinion." *Burgess,* 537 F.3d at 131 (quoting *Shaw v. Chater,* 221 F.3d 126, 134 (2d Cir. 2000)). For that matter, an ALJ cannot "set his own expertise against that of a physician who [submitted an opinion to or] testified before him." *Balsamo v. Chater,* 142 F.3d 75, 81 (2d Cir. 1998) (quoting *McBrayer,* 712 F.2d at 799) (brackets added in *Balsamo*).

An ALJ must both "develop the proof" and "carefully weigh it" before deciding which medical expert to credit. *Donato v. Sec'y of Dep't of Health & Human Servs.,* 721 F.2d 414, 419 (2d Cir. 1983). "[A]n ALJ cannot reject a treating physician's diagnosis without first attempting to fill any clear gaps in the administrative record." *Rosa v. Callahan,* 168 F.3d 72, 79 (2d Cir. 1999). In determining what weight to give to the treating physician's opinion, the ALJ is required to apply various factors including (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) the evidence that supports the treating physician's report; and (4) how consistent the treating source's opinion is with the record as a whole. 20 C.F.R. § 404.1527(c). In addition, SSA regulations require the ALJ "to provide 'good reasons' for the weight she gives to the treating source's opinion." *Halloran,* 362 F.3d at 32-33 (citing *Schaal v. Apfel,* 134 F.3d 496, 505 (2d Cir. 1998)). The Second Circuit has stated that it will "not hesitate to remand when the Commissioner has not provided 'good reasons' for the weight given to a treating physician's opinion and ... will continue remanding when ... encounter[ing] opinions from ALJ's that do not comprehensively set forth reasons for the weight assigned to a treating physician's opinion." *Id.* at 33.

In evaluating plaintiff's residual functional capacity in this case, the ALJ did not choose between properly submitted medical opinions, but substituted her own expertise or view of the medical proof for the treating physician's opinion. The ALJ found, *inter alia*, that plaintiff had the residual functional capacity to stand and walk for 30 minutes at a time for up to 4 hours a day; to sit for 30 minutes at a time up to 8 hours per day; and to reach overhead, push, pull, climb stairs and ramps, balance, stoop, kneel, and crouch occasionally (27). However, this finding is inconsistent with the opinions of the three medical experts who examined plaintiff and offered an assessment of her residual functional capacity. Dr. Jacoby opined that plaintiff could not "sit, stand or ambulate more than 1 hour continuously without changing positions" and could not lift, push or pull more than 10-20 pounds (221). Dr. Caiati opined that plaintiff would have a "minimum to mild limitation" in bending and lifting, but was not at all limited in '[s]itting, standing, walking, reaching, pushing, pulling, and climbing" (377). Dr. Graham opined that plaintiff had only "mild limitations with reaching, pushing, pulling and lifting using the right upper extremity" (552). To be sure, the history section of Dr. Graham's report noted that plaintiff claimed her low back pain increased if she sat or stood for more than 30 minutes, walked more than six blocks, or attempted to lift more than 30 pounds (549). However, the doctor herself did not opine that plaintiff had any such limitation.

The ALJ also found that plaintiff had the residual functional capacity to frequently handle items (27). That finding was contrary to the assessment of Dr. Jacoby, who opined that plaintiff should "avoid fine motor use of the right hand" (221). Since Dr. Jacoby was plaintiff's treating physician, the ALJ was required to provide "good reasons" for her decision to accord no weight to Dr. Jacoby opinion regarding plaintiff's right hand. *See Halloran*, 362 F.3d at 32-33.

However, the ALJ stated only that Dr. Jacoby's assessment of plaintiff's limitations in using her hand were "contradicted by nerve conduction studies, claimant's activities of daily living, and the clinical findings of Dr. Caiati and Dr. Graham" (30).

None of these were good reasons. First, the only "nerve conduction studies" which the ALJ discussed in her opinion were the studies performed by Dr. Jacoby (29). Although the ALJ's opinion states that those studies were performed on August 10, 2011 (29), they were actually performed on June 1, 2011 (234-37, 398-401), about two months before Dr. Jacoby penned his assessment of plaintiff's residual functional capacity. Because Dr. Jacoby had conducted the studies, one can assume that the doctor was well aware that the nerve conduction velocity study revealed mild cubital tunnel syndrome in the right wrist—a condition which could cause numbness in the fingers of the right hand. *See* htp://orthoinfo.aaos.org/ topic.cfm?topic= 00069. One can also assume that the doctor took those findings into consideration in formulating his opinion of plaintiff's ability to use her right hand.

In stating that the results of the nerve conduction velocity test contradicted Dr. Jacoby's assessment, the ALJ was setting her own expertise against that of Dr. Jacoby. The ALJ was implicitly holding that Dr. Jacoby erred in opining that plaintiff was limited in the use of her hand because that opinion was contrary to the findings of the "nerve conduction studies." Even if that were true, the ALJ, as a layperson, could not set her own expertise against that of a physician. *See Balsamo*, 142 F.3d at 81. Accordingly, the results of the nerve conduction velocity studies cannot constitute a "good reason" for disregarding Dr. Jacoby's opinion.

Second, Dr. Jacoby's assessment was not contradicted by plaintiff's account of her activities of daily living. To the contrary, plaintiff repeatedly testified to limitations in the use of

her dominant right hand. For example, during the November 2, 2011, hearing, plaintiff testified that she would lose feeling in her hand and drop plates and cups (46), that she was unable to write more than a paragraph at a time (46), and that she could not lift even a gallon of milk (50-51).[16] While plaintiff, a single mother, testified that she was still able to perform many of the tasks necessary to care for her young sons, she made it clear that she had "learned to do a lot of things with [her] left hand" (47). For example, she "learned how to cook with [her] left [hand]" and washed the dishes slowly and "extra, extra careful[ly]" to avoid dropping them (51). She also prevailed upon others, such as her children and the father of her two youngest sons, to do the tasks she could no longer perform, such as the laundry and carrying groceries upstairs (51-52).

Third, while Dr. Caiati's conclusion that plaintiff was not limited in her ability to push or pull (377) was contrary to the conclusion reached by Dr. Jacoby (221), Dr. Caiati's clinical findings were largely consistent with Dr. Jacoby's clinical findings. Dr. Caiati examined plaintiff on November 8, 2010, about three months before plaintiff began seeing Dr. Jacoby. His examination revealed that plaintiff had a decreased range of motion in the right wrist: dorsiflexion (also called flexion) of 50 degrees and palmar flexion (also called extension) of 60 degrees (377).[17] At that juncture, her grip and pinch were normal and her "[h]and and finger dexterity intact" (377).

---

[16]The Court will take judicial notice of the fact that a gallon of milk weighs less than ten pounds.

[17]Normal values are 70 to 90 degrees for dorsiflexion, the backward bending of the wrist, and 65 to 85 degrees for palmar flexion. *See* http://www.livestrong.com/article/93432-normal -range-motion-wrist/.

35

Like Dr. Caiati, Dr. Jacoby found that plaintiff had a decreased range of motion. When Dr. Jacoby first saw plaintiff on February 1, 2011, plaintiff's range of motion had deteriorated somewhat, to flexion of 25 degrees and extension of 30 degrees (419). Dr. Jacoby did not measure the range of motion in plaintiff's right wrist on subsequent visits, but noted that plaintiff continued to have a decreased range of motion. However, the range of motion varied visit to visit. On March 28, 2011, Dr. Jacoby noted a "mild to moderate" decrease in flexion and extension (417). On May 26, 2011, Dr. Jacoby characterized the decrease in flexion and extension as moderate (413). About a month later, Dr. Jacoby's report noted that plaintiff had a moderate to severe decrease in flexion and extension, plus a decrease in radial and ulnar deviation (407). However, by July 22, 2011, Dr. Jacoby again characterized the decrease in flexion and extension as moderate, and made no mention of a decrease in radial or ulnar deviation (405).

Unlike Dr. Caiati's findings, Dr. Graham's clinical findings differed from those of Dr. Jacoby. Dr. Graham examined plaintiff on September 7, 2011, about six weeks after plaintiff's July 22 visit to Dr. Jacoby. Dr. Graham found that plaintiff had only a slightly decreased range of palmar flexion in her right wrist: 65 degrees compared with 70 degrees on the left (551). The doctor also measured plaintiff's radial and ulnar deviations (551), which were essentially normal at 20 degrees and 30 degrees.[18] Yet, despite finding that plaintiff's range of motion was almost normal and that her strength was "5/5 in proximal and distal muscles bilaterally" (551), Dr. Graham found that plaintiff had "mild limitations with reaching, pushing, pulling and lifting using the right upper extremity" (552). That assessment, though too vague to

---

[18]Dr. Graham did not mention plaintiff's range of dorsiflexion in her report.

be of assistance in evaluating whether plaintiff could perform light or sedentary work, was

consistent with that of Dr. Jacoby, who opined that plaintiff could not lift, push or pull more than

10 to 20 pounds. Accordingly, even if Dr. Graham's clinical findings differed significantly from

those of Dr. Jacoby, Dr. Graham herself did not conclude that those findings justified the

conclusion that plaintiff had no limitations. The ALJ, as a layperson, was not justified in

drawing a contrary conclusion from the medical evidence on her own.

Even if Dr. Caiati's and Dr. Graham's reports had contained clinical findings which

justified the conclusion that plaintiff was not limited in the use of her right hand, and even if the

ALJ was qualified to draw that conclusion, the ALJ's conclusion was based on an incomplete

record. The Administrative Record indicated that plaintiff had been examined or treated by at

least four other physicians for her hand and wrist problems. First, Dr. Stanley S. Remer

performed surgery on plaintiff's right wrist on May 24, 2010 (319-92). However, the

Administrative Record contains no records from Dr. Remer aside from his operative report.

Second, the Administrative Record contains a report of a nerve conduction study and an

electromyography performed by Dr. Appasaheb Naik on July 28, 2010 (380-82). The studies

found evidence of left carpal tunnel syndrome, and the doctor recommended use of a "cock-up

splint" on the wrist at night (382). At the August 11, 2011, hearing, the ALJ noted that she had

"just ... one report" from Dr. Naik (70). Yet, she did not subpoena Dr. Naik's records or make

any effort to ascertain the identity of the medical professional who referred plaintiff to Dr. Naik

and to whom Dr. Naik made his recommendation.

Third, a Disability Report prepared prior to the ALJ's second hearing indicated that

plaintiff was being treated by Dr. Wilen for her right wrist problems at the time Dr. Naik issued

his report. Indeed, the Disability Report identified Dr. Wilen as the "[p]rimary care provider" for plaintiff's right wrist and right arm; indicated that plaintiff first visited Dr. Wilen in June 2010; last saw him on August 26, 2010; and was scheduled to see him next on October 7, 2010 (196). However, there is no indication that the ALJ made any efforts to obtain Dr. Wilen's records. The Administrative Record not only lacks documents relating to any of these three visits, but contains no records of any visits to this provider until February 23, 2012 (295-97).

Fourth, at the November 2, 2011, hearing, plaintiff testified about two recent visits to Dr. Patel, a hand surgeon (47). Plaintiff had the doctor's card and provided the ALJ with the surgeon's address (47). Again, there is no indication that the ALJ made any efforts to obtain the records from these visits. The Administrative Record does not contain any medical evidence from this doctor.

These four doctors' records were not the only medical evidence missing from the Administrative Record. Most notably, there are no records whatsoever from Dr. Harewood, the physician whom plaintiff described as her primary care doctor at the time of the August 11, 2011, hearing (71). However, the failure to obtain all of the records of Drs. Remer, Naik, Wilen and Patel was particularly egregious because the ALJ's finding that plaintiff was able to use her dominant right hand was crucial to her determination that plaintiff could perform light and sedentary work. To determine if there were jobs available to plaintiff, the ALJ asked the vocational expert, Andrew Vaughn, to assume a hypothetical individual who was capable of, among other things, "occasional pushing and pulling and frequent handling" (59, 60). Based on these assumptions, Vaughn testified that there were light work and sedentary jobs in the national economy available to the hypothetical individual.

38

Vaughn did not testify, however, that such jobs would be available to an individual who was unable to use the dominant hand for manipulative tasks. When the ALJ changed the hypothetical, asking Vaughn to assume an individual who could not "use ... the dominant right arm ... except for propping and support" and "could not use it for manipulative tasks," Vaughn testified that a "hypothetical individual unable to use their right dominant arm for any manipulative task would be unable to perform duties at the light level [INAUDIBLE] if we're looking at all the other limitations that were involved in terms of low-stress" (63). The ALJ asked the expert again, instructing him to focus on the hypothetical she provided, which made no mention of stress (63). Although portions of Vaughn's answer to this question were inaudible, the expert's opinion appears to have remained unchanged. When the ALJ then asked if there would be "any sedentary work jobs," the vocational expert again implied that no jobs would be available, saying, "the job base would be eroded at sedentary if the ... hypothetical individual is unable to use ... the dominant hand" (63).

The ALJ's finding that plaintiff had the residual functional capacity to manipulate things frequently with her right hand was, therefore, crucial to her conclusion that plaintiff could perform jobs that exist in significant numbers in the national economy. However, in determining plaintiff's residual functional capacity, the ALJ failed to comply with the SSA's regulations by, among other things, failing to fully develop the Administrative Record, disregarding treating physicians' opinions as to plaintiff's residual functional capacity without providing "good reasons," and relying on her own expertise to reach an opinion of plaintiff's residual functional capacity that was not shared by any medical professional. Since the ALJ failed to apply the correct legal principles and since it is unclear that the ALJ would have

39

reached the same conclusion if she had applied those principles, this matter is remanded to the Commissioner for action not inconsistent with this Memorandum and Order.

### *CONCLUSION*

For the reasons set forth above, this Court denies the Commissioner's motion for judgment on the pleadings and grants plaintiff's cross-motion to the extent of remanding this action to the Commissioner for further proceedings not inconsistent with this Memorandum and Order.

**SO ORDERED.**

/s/ Sandra L. Townes
SANDRA L. TOWNES
United States District Judge

Dated: May 17, 2016
        Brooklyn, New York